IN THE UNITED STATES
DISTRICT COURT FOR THE
NORTHERN DISTRICT OF
ILLINOIS EASTERN
DIVISION

| | | |
|---|---|---|
| SHEQUILA WILSON | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 C 17059 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, about four years ago in August 2020. (Administrative Record (R.) 290-91). She claimed that he had been disabled since August 6, 2020 (R. 290, 312) due to "Joint Arthritis, Hypertrophy, Kyphosis, Spinal Stenosis; Hypothyrodism; Pulmonary Sarcordosis of the lungs; Hypertention; Anxiety; Depression; Stress; Memory Loss." (R. 312). Plaintiff's application was denied at the initial and reconsideration levels but granted in part at the administrative law judge (ALJ), and appeals council levels. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on December 22, 2023, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on January 17, 2024. (R. 9). Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "cervical and lumbar spine degenerative disc disease; major depressive disorder with psychosis; and generalized anxiety disorder." (R. 64). The ALJ determined that the plaintiff's history of pulmonary sarcoidosis, COPD, history of pulmonary emboli, anemia, and hypothyroidism were not severe impairments. (R. 64). The ALJ also found that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, focusing on Listing 1.15 (cervical and lumbar degenerative disc disease), Listing 1.16 (lumbar degenerative disc disease), and Listings 12.04 and 12.06(mental impairments). With regard to the plaintiff's mental impairments, the ALJ found that the plaintiff had mild limitations in understanding, remembering, or applying information; and interacting with others. (R. 66). The ALJ found the plaintiff had moderate limitations in concentrating, persisting, or maintaining pace; and in adapting or managing oneself. (R. 66).

The ALJ then found that the plaintiff could perform light work subject to the following list of additional limitations:

> frequently push/pull with the left upper extremity; frequently reach overhead bilaterally; frequently handle and finger bilaterally; occasionally balance, stoop, kneel, crouch, and crawl; occasionally climb ramps/stairs; never climb ladders, ropes, or scaffolds; never work at unprotected heights or around moving mechanical parts; occasional exposure to dusts, odors, fumes, or other pulmonary irritants; occasional exposure to extreme cold; and due to moderate limitations in concentration, persistence or pace, the [plaintiff] is restricted to understanding, remembering, and carrying out simple, routine tasks with no fast-paced production requirements (e.g. assembly line work). (R. 66-67).

The ALJ next summarized the plaintiff's allegations, noting that she said that some

days she was unable to lift/carry the 50 pounds required to be a nurse assistant. She had difficulty stooping, standing, and sitting for extended periods due to neck and back pain. She cooked but only meals that took no more than 30 minutes to prepare. She rarely drove and usually relied on her daughter to take her to appointments and handle grocery shopping. She sometimes needed help dressing. She said she had no social activities and did not go anywhere regularly. She took more time to complete tasks, and her attention span was limited to 10. She testified she could stand 5-10 minutes, sit 10-20 minutes, walk half a block before needing to rest. She said stress can her angry, that she has anger issues, and that she hears voices. (R. 67). Plaintiff's daughter said that her mother her mother shad difficulty standing, walking, and using her hands. She needed reminders for appointments, could not lift more than 10 pounds, stand more than 10 minutes, or walk more than half a block. Plaintiff's daughter also said her mother did not handle stress well and feared falling. (R. 67). The ALJ concluded that the "[plaintiff] and her daughter's statements about the intensity, persistence, and limiting effects of [plaintiff's] symptoms are inconsistent with the medical and other evidence." (R. 67).

  The ALJ went on to summarize that medical evidence, noting that, in early 2021, with plaintiff complaining of neck and back pain, imaging studies note a C6-7 disc protrusion with potential effect on the right exiting C7 nerve root, as well as L4-5 foraminal stenosis secondary to intervertebral joint arthritis/hypertrophy. Plaintiff got good results from injection therapy, noting only mild discomfort thereafter. At plaintiff's July 2021 consultative examination, she exhibited full, non-tender range of motion through the spine, with negative straight leg raises despite a slowed gait. She could get on and off an exam table without difficulty, and had no more than mild difficulty heel walking, tandem walking, and squatting. Grip strength and manipulative

3

skills were normal, as were upper and lower extremity strength and sensation. The ALJ noted previous exams before the period at issue demonstrate some slightly reduced grip strength, but explained that he accounted for that with handling and fingering limitations. (R. 68). The next instance in the record of back treatment was in December 2021, when the plaintiff had a flareup of her low back pain. She exhibited spinal and paraspinal muscle tenderness, but sensation and lower extremity strength were normal. After that, she needed no further treatment in 2022 or 2023, suggesting her pain was relatively well controlled. The ALJ explained that, due to the dearth of medical evidence for the period, he ordered a consultative evaluation in January 2023. Plaintiff exhibited a normal gait, normal ability to heel and toe walk, and partial squatting ability. Grip strength, fine/gross motor skills, extremity strength, and sensation were all intact. The ALJ allowed that there was some tenderness upon lumbar palpation, and positive bilateral straight leg raises. The lumbar spine and right hip demonstrated slight range of motion deficits, while the cervical spine showed more notable deficits, particularly with extension and lateral bending. The ALJ explained that, based on these findings and the previous findings, plaintiff appeared capable of light exertional work, with the additional limitations set forth in his RFC. (R. 68).

The ALJ went on to discuss the medical evidence pertaining to plaintiff's mental health. He noted that plaintiff had a hospital stay in December 2020/January 2021 for psychosis and mania, with paranoid delusions and auditory hallucinations secondary to worsening depression and multiple life stressors including job loss, altercations with her husband, and the death of her mother. She exhibited limited insight/judgment in February 2021, but no psychosis. She had another episode of paranoia in June 2021, and was back in the hospital for a six-night stay. She reported auditory hallucinations and paranoid delusions, believing that her ex-husband was

controlling her body through an app. But, she demonstrated "marked improvement" with treatment. It was noted that some of her symptoms appeared to be related to an ongoing divorce occurring in 2021, after 22 years of marriage. Three weeks after plaintiff was discharged, she went briefly to the emergency room and reported being stalked by another individual, but had no hallucinations, no suicidal/homicidal ideations and cooperative behavior. (R. 68-69).

At a July 2021 consultative psychological evaluation, the plaintiff reported ongoing paranoid delusions and auditory hallucinations. Her mood was noted to be depressed and her affect blunted. Her attention span was normal for digit span tasks, she had intact short-term/immediate memory, intact fund of information, and normal judgement. She was able to perform arithmetic calculations and engage in abstract thinking by identifying similarities between two differing objects. The examiner noted that the plaintiff was cooperative, but lacked initiative or spontaneous speech. (R. 69).

The ALJ noted that the plaintiff next sought treatment in December 2021, at which time she was noted to have a positive outlook and mood and had an unremarkable mental status exam with no thought content abnormalities and good insight/judgment. She did continue to go through episodes of psychosis and related paranoia, with these thoughts largely related to her ex-husband, as she believed people related to him are following her despite her attempts to move away, and further believed people are "remotely controlling" her. Her routine functioning was said to be chaotic and disorganized, though she could complete activities of daily living. (R. 69). She had another consultative psychological evaluation in 2023, where she again reported delusions of being stalked/harassed and notes non-command auditory hallucinations. Upon examination, she exhibited intact memory and fund of information. She performed arithmetic calculations slowly,

5

but accurately. She could still identify similarities between common objects, but struggled interpreting proverbs and demonstrated some unreliable judgment and concrete thinking. (R. 69). The ALJ said that, in view of these ongoing symptoms, the plaintiff "appear[ed] capable of performing simple, routine tasks with no fast-paced production requirements (e.g., assembly line work) [which] account[ed] for her ongoing mild psychosis and concrete thinking, but otherwise intact cognitive abilities . . . ." The ALJ added that he did not find that the plaintiff required "any additional restrictions in connection with her moderate limitations in adapting or managing her symptoms, as simple, routine tasks in a work environment without fast-paced requirements sufficiently accounts for the [plaintiff]'s need to adapt to potential paranoid or delusional thoughts." (R. 69).

The ALJ went on to consider the medical opinions. He rejected the initial state agency reviewers' opinion that the plaintiff had no mental impairment as unpersuasive, noting there were no medical records as to plaintiff mental health at the time of the review. The ALJ also found the reconsideration opinion restricting the plaintiff to multi-step tasks and ability to adapt to routine changes unpersuasive as well. The ALJ explained that, "[g]iven the [plaintiff's] intermittent psychosis and paranoid delusions, her symptoms are consistent with and supported by no more than simple, routine tasks, . . . Additionally, a restriction to routine changes in the context of simple, routine tasks is redundant, as any changes to such tasks would necessarily be routine." The ALJ added that "the lack of limitation on fast-paced production work is inconsistent with the [plaintiff's] accurate but slowed arithmetic calculations at her most recent testing." (R. 70).

The ALJ next found the opinion from Dr. Ramchanandi as too restrictive – only two hours of combined sitting, standing, and walking in an eight-hour day – and unsupported by the doctor's

6

clinical findings. The ALJ also found it was inconsistent with the findings from a previous consultative exam and the overall lack of medical treatment during the period at issue. The ALJ also rejected the similarly work-preclusive opinion from Leslie Greskowiak, NP. (R. 71). It was inconsistent with the plaintiff's 2021 and 2023 consultative evaluations showing intact lower extremity strength, intact fine/gross manipulation, and no more than mild deficits in walking and squatting. It was also inconsistent with the nurse's notes which showed good relief with over-the-counter medications. (R. 71).

The ALJ said the opinion from Mark Langgut, Ph.D., that the plaintiff had a moderate limitation in making simple work-related decisions, marked limitations in complex instructions/decisions, and mild limitations in all other areas of mental work activity was "generally persuasive because it supported a restriction to simple, routine tasks with no fast-paced production requirements; and was supported by Dr. Langgut's psychological evaluation noting intact memory, fund of information, and calculation abilities despite some paranoia and delusional thought content; and by the plaintiff's intact attention, fund of information, arithmetic calculations, and ability to identify similarities between two common objects, with intermittent hospitalizations related to paranoid delusions and hallucinations that improve with treatment. (R. 71).

The ALJ next relied on the testimony of the vocational expert to find that the plaintiff was unable to perform any of her past relevant work. The demands of those jobs exceeded the limits of the ALJ's residual functional capacity finding. (R. 72). But, the vocational expert also testified that the plaintiff could perform other jobs that existed in significant numbers in the national economy, such as Mail Clerk ( DOT# 209.687-026, approximately 60,000 jobs), Storage Facility Rental Clerk (DOT# 295.367-026, approximately 125,000 jobs), and Cleaner/Housekeeper

(DOT# 323.687-014, approximately 105,000). (R. 73). The ALJ then relied on this testimony to conclude that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 73-74).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . .

the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the plaintiff meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of

9

those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek he can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and

evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"— an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). The ALJ did enough here.

### III.

The plaintiff makes two arguments for reversing the ALJ's decision. The first is that the ALJ's residual functional capacity assessment did not account for plaintiff's limitations in adapting or managing herself. The second is that the ALJ's failed to support his evaluation of the subjective symptom testimony provided by the plaintiff and her daughter with sufficient

11

evidentiary support and disregarded the non-medical evidence. As the plaintiff's first argument merits a remand – indeed, review of the record shows her difficulties adapting or managing herself are rather significant – we won't be addressing her second.

At her administrative hearing, the plaintiff's lack of insight into her condition was fairly clear. She told the ALJ that she hadn't taken medication for her mental impairments or been to the doctor "in a while." (R. 108). She explained that her neighbor had been stalking and harassing her, having relations with her ex-husband. She complained that the police wouldn't believe her and said it was schizophrenia. (R. 108-09). But, this woman was constantly following her (R. 109), and taking photos and posting them on social media. (R.109-10). The plaintiff allowed that she hadn't actually seen the photos, but could hear the conversation about them in her ear. (R. 110).

That tracks pretty well with the plaintiff's interactions with healthcare providers. In December 27, 2020, the plaintiff was admitted for psychiatric treatment. She was complaining about a bug implanted in her head, auditory hallucinations. Doctors noted acute symptoms and multiple suicide risk factors. (R. 621). She was treated and prescribed Zoloft, but she stopped taking it shortly after discharge. And, she didn't follow up with treatment. (R. 815, 829). She felt she didn't need it, although she had the stress of going through a divorce from her husband. (R. 815). Doctors then put her back on Zoloft, but in May 2021, plaintiff reported no change in her symptoms. She said she harbored thoughts of harming others, but explained that they were provoked. She hadn't talked to a counselor in months and didn't want to go to in-patient treatment. (R. 829).

The attending doctor certainly did not like the sound of things:

> I am worried for her health and safety. Urged her to go to ER or Linden Oaks same-day services. She refuses ER but states she will stop downstairs at Linden

> Oaks before leaving the building today to schedule an appointment with counselor and psychiatry. Linden Oaks same-day services phone number provided to patient as well, urged her to go today. Instructed her that she must go to the ER with thoughts of hurting herself or others. She verbalized agreement and stated that she does not intend to harm anyone. (R. 833).

Plaintiff never followed up, and, on October 6, 2021, she reported she was off all psychiatric medications and had not seen her psychiatric provider. Plaintiff again said she didn't think the medications helped. (R. 846).

As the ALJ acknowledged (R. 64, 72), the plaintiff made some attempts to try to work despite all this. Those attempts didn't last long; the plaintiff explained that her work aggravated her neck and back impairments. (R. 95-96). The ALJ apparently accepted that, but it wasn't exactly the whole story. One of the last times the plaintiff tried working, in June 2022, she was asked to leave, and it had nothing to do with her back or neck. It had to do with a conversation she had with her supervisor when she missed a shift, and it paints a different picture of the plaintiff's ability to fit into a work environment than the one the ALJ's decision depicted:

> During that conversation, you stated:
>
> ·You are being stalked by three people related personally to your husband that has followed you throughout the 4-5 relocations and 5 plus different jobs.
>
> ·The stalkers are "bugging" your home & and Saint Joseph Village, along with using associates within Saint Joseph Village.
>
> ·These 3 people and your husband are unknown to Saint Joseph Village or associates.
>
> ·You fear for yourself and our residents from these people.
>
> ·You have filed for an order of protections in many different cities, and they have been denied.
>
> ·You filed a police report as well regarding this matter.

>·You reported your personal information and are images being released without your permission on social media and an app called "hartgrove".
>
>· Distant conversations, voices, and data from social media/the app listed above "being amplified" in your ears/mind.
>
>·You heard current associate's conversations in our dining hall, which is greater than 50 feet from you, about the above issues while you were providing care to our residents.
>
>·Hearing conversations/ voices that are not present within earshot of you or not even within the same location.
>
>·You could not notify your leader that you would not be able to work your scheduled shift because you feel others controlling you remotely and in her body.
>
>·"People remotely controlling" her come and go.
>
>·"People remotely controlling" her could impair your job and safety to residents.
>
>Your actions appeared to be concerning and we are concerned about your ability to perform the essential functions of your job. . . . in order for us to ensure that you are able to safely perform your duties, we would like your treating clinician to submit a written statement to us about your condition and ability to work, as well as any possible accommodations you may need to perform the essential inactions of the position.   (R. 1262).

Needless to say, there was no letter from plaintiff's treating clinician saying she was okay to work.

The ALJ didn't go this far or this deep into the record. As was stated earlier, the substantial evidence standard is fairly lax, but it does require some assurance that the ALJ considered and grappled with the evidence running counter to his decision and gave a rational for going the other way.  *Warnell*, 97 F.4th at 1054; *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022); *Grotts*, 27 F.4th at 1278 (7th Cir. 2022). With the ALJ stating that the plaintiff been able to work a bit and that her condition improved with treatment (R. 68, 71), the ALJ didn't quite hit the mark here.   The evidence tends to show the plaintiff's condition caused a lack of insight into her

need for treatment, *see, e.g.,Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996), and that her condition caused concerns for at least one employer and plaintiff's co-workers.

But, the problem goes beyond that. Addressing the plaintiff's ability to adapt and manage herself, the ALJ found that the plaintiff's "daily routine [wa]s chaotic and disorganized," but that she could "complete activities of daily living independently." (R.66). The ALJ further found that she needed "help remembering medical appointments" and that "[p]aranoid and delusional thought content [was] an ongoing issue and limit[ed] insight into her condition." (R. 66). The ALJ concluded that all that added up to a moderate limitation in the plaintiff's ability to adapt or manage herself.

To be frank, the court isn't sure "moderate" covers it. A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Seventh Circuit has noted that "'fair' in ordinary usage does not mean 'bad' or 'inadequate.'" *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). Given the evidence here, the needle seems to drift closer to "bad" than "fair."

But, in any event, having found a moderate limitation, the ALJ had to account for it in his residual functional capacity finding. *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022); *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). He tried to do so like this:

> Given these ongoing symptoms, she appears capable of performing simple, routine tasks with no fast-paced production requirements (e.g., assembly line work). This accounts for her ongoing mild psychosis and concrete thinking, but otherwise intact cognitive abilities as detailed herein. I find that the [plaintiff] does not require any additional restrictions in connection with the moderate limitations in adapting or managing her symptoms, as simple, routine tasks in a work environment without fast-paced requirements sufficiently accounts for the [plaintiff]'s need to adapt to potential paranoid or delusional thoughts. (R. 69).

15

That sets off the common-sense alarm bells right away. Adapting and managing onself doesn't sound a lot like concentrating and persisting, so it would seem that the same restrictions wouldn't take care of both deficits. That's not to say that one's "CPP" wouldn't be affected if one were hearing voices from a chip in one's head, but it would seem that there would need to be another layer of accommodation geared toward adapting and managing.

That commonsense reaction is borne out by the Social Security Administration's own language:

> Adapting or managing oneself. This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(E)(4).

Without more of an explanation than the ALJ provided, it's difficult to see how limiting someone to "simple, routine tasks with no fast-paced production requirements" (R. 67) takes care of limitations in the foregoing areas. In other words, it's not self-evident and that's where the "logical bridge" requirement comes in. There may be some overlap in some cases but, generally, restrictions like "few if any workplace changes" or "limited interaction with coworkers or supervisors" deal largely with workplace adaptation issues, as opposed to CPP issues. *See, e.g., Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015); see also *Joshua D. v. Kijakazi*, No. 121CV02228JMSTAB, 2022 WL 1769020, at *8 (S.D. Ind. June 1, 2022)(". . . the only limitations in the RFC that could relate to the ability to adapt or manage oneself are the limitations to no

16

interaction with the public; brief, incidental interaction with coworkers; and no tandem job tasks requiring cooperation with coworkers."); *Benjamin G. v. Kijakazi*, No. 19 CV 04558, 2022 WL 2208865, at *7 (N.D. Ill. June 21, 2022)(allowing that "[i]t may be possible that limitations to 'unskilled work,' and 'routine changes' in the work environment do accommodate moderate limitations in 'adapting or managing oneself' and 'understanding, remembering, or applying information'" but remanding for the ALJ to "clearly explain how his renewed RFC formulation specifically accounts for these moderate limitations as well.").

The ALJ did say that he refused to include a restriction to routine changes because "in the context of simple, routine tasks" it would be "redundant, as any changes to such tasks would necessarily be routine." (R. 70). Of course, we wouldn't want anything redundant in a decision but, again, without more of an explanation it is difficult to see how nothing more than "routine changes to tasks" would account for paranoid delusions stemming from a purported chip in one's head. The Commissioner's citation to *Truelove v. Berryhill*, 753 F. App'x 393 (7th Cir. 2018) as evidence that one can be found not disabled despite and "intermittent explosive personality disorder [and] schizoaffective disorder" [Dkt. #18, at 10]. But there, the court found there was substantial evidence that the plaintiff "ha[d] sufficiently managed his psychological symptoms with medication . . . ." 753 F. App'x at 397. As noted earlier, here the evidence is that the plaintiff repeatedly foregoes medication and treatment because she does not think – or cannot understand – that she needs it. Notably, the psychologist who evaluated the plaintiff for the agency opined that "[w]ithout appropriate treatment for her condition, the claimant may have difficulty interacting with others. With treatment, she may well be able to return to a baseline level of functioning that would allow her to again work and live independently." (R. 1581). The rub, of course, is that

17

the plaintiff isn't getting the treatment she needs to manage her mental impairment due to her mental impairment. This aspect of the plaintiff's case was not adequately analyzed, especially given the fact that the Commissioner and the ALJ seem to be considering only what a *treated version* of the plaintiff might be capable of doing.

As discussed earlier and exemplified by the Seventh Circuit's decision in *Jarnutowski*, "logical bridges" aren't one-size-fits-all. Some reviewers need more explanation than others, and each reviewer in federal court is reviewing the ALJ's decisions *de novo*. In terms of what constitutes an adequate "logical bridge," every *de novo* reviewer is different. And every medical record is different. Some records are such that not much of a "bridge" is needed to go from evidence to conclusion. But, a record like this one, given the issues the plaintiff has, is more complex. We are not talking about getting from one side of a creek to the other; we're talking about something much more akin to the straits of Mackinac. So, much more of a "logical bridge" was needed from the ALJ.

## CONCLUSION

For the foregoing reasons, this case is remanded to the Commissioner for further proceedings. The plaintiff's motion for judgment on the pleadings [Dkt. #14] is granted, and the defendant's motion for summary judgment [Dkt. #17] is denied.

ENTERED: _____
UNITED STATES
MAGISTRATE JUDGE

18

**DATE:** 9/23/24